**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CONSTANCE PIETRZAK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 15227** |
| | ) | |
| **ADVOCATE HEALTH AND** | ) | |
| **HOSPITALS CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

From 2014 to 2022, Dr. Constance Pietrzak was employed as a

gastroenterologist at hospitals operated by Advocate Health and Hospitals Corporation.

In 2018, Dr. Pietrzak began experiencing seizures. Her physician determined that her

seizures were at risk of increasing if she continued working night shifts. Based on her

doctor's guidance, Dr. Pietrzak asked Advocate to relieve her from overnight call duties.

Advocate did so for around six months until November 2021. Advocate then

determined that continuing the accommodation was not feasible and indicated an

alternative arrangement would have to be made. Dr. Pietrzak contends, however, that

Advocate ultimately did not offer any reasonable accommodation and failed to properly

engage in the interactive process with her to find a solution. She says she expressed

interest in moving forward with one of Advocate's alternate proposals, but Advocate

never initiated the next steps. Instead, it terminated Dr. Pietrzak's employment on

August 4, 2022, saying they had reached an impasse.

Dr. Pietrzak has sued Advocate, alleging that it discriminated and retaliated against her under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112, 12203(a) (counts 1, 2, 3), the Illinois Human Rights Act (IHRA), 775 Ill. Comp. Stat. 5/2-102(A), 5/6-101 (counts 4, 5, 8, 9), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(1), 2000e-3a (counts 6, 7). Advocate has moved for summary judgment.

## Background

Constance Pietrzak began working as a gastroenterologist (GI) physician for Advocate Health and Hospitals Corporation (Advocate) in October 2014. Advocate operates three hospitals in the South Chicagoland area—South Suburban, Trinity Hospital, and Advocate Christ Medical Center—as well as five clinics. Dr. Pietrzak was assigned to the South Suburban Hospital in Hazel Crest, but between 2014 and 2018, she split her time between South Suburban and Trinity Hospitals.

Dr. Pietrzak's employment contract with Advocate stated that "Physician acknowledges that such coverage may require Physician to be present at the Assigned Site(s) for a certain number of evenings and weekends as shall be determined jointly by AMG and Physician to be reasonably necessary and proper. Physician shall provide 'on call' coverage as reasonably required to maintain and sustain the Practice." Def.'s Ex. 8. Overnight calls require doctors to be available by telephone during the night and, in certain circumstances, to come into the hospital to handle emergency cases. A doctor on overnight call is not permitted to drink alcohol the night before and must make other restricting lifestyle arraignments to prepare for on-call shifts. When Dr. Pietrzak started in 2014, she provided three weeks of hospital inpatient daytime coverage per year and

covered three on-call weekends per year. She alleges that none of the other gastroenterologists at South Suburban covered overnight call until 2018.

Dr. Pietrzak is a woman who has suffered from epilepsy for many years. In 2018, Dr. Pietrzak began experiencing seizures again because of, she suspected, a medication change due to her pregnancy. After returning to work from maternity leave, Dr. Pietrzak suffered more seizures, including on May 31, 2021.

Around this time, Dr. Pietrzak's personal physician determined that sleep deprivation was directly causing and triggering her seizures and that it posed a "severe hazard to her health if she was exposed to continuous and regular interruptions to her sleep." Compl. ¶ 11. Dr. Pietrzak and her physician agreed that overnight calls greatly exacerbated her chance of seizures because of the interruptions to her sleep and the need to drive to the hospital at night. As a result of this health guidance, Dr. Pietrzak asked Advocate to relieve her from covering overnight calls at the hospital.

**B.    Dr. Pietrzak's first accommodation request**

In early June 2021, in response to her request for an accommodation, Dr. Pietrzak and her supervisor, Dr. Pintozzi, worked out an arrangement by which Dr. Pietrzak would cover overnight calls only until 10:00 p.m., in exchange for covering two additional evenings of call each time another doctor covered one of her overnight call shifts.

Around June 15, 2021, Pietrzak emailed Dr. Chintan Mistry, the Chief Medical Officer in the South Chicagoland area. She asked to be relieved from overnight call after 10:00 p.m. without taking any additional calls from other doctors for an open-ended period of six to eighteen months. After discussing her request with other physicians in

3

Advocate's Reasonable Accommodation Committee / Leave Management Team (RAC), the RAC approved her request, intending to revisit it in six months. On June 25, 2021, Dr. Pietrzak submitted the required documentation to request an accommodation, including her medical documents, through RAC's formal accommodation procedure. The RAC officially approved the request on August 18, 2021, stating that it would revisit the accommodation on December 31, 2021. A revised letter was sent on August 20, 2021 updating the date of revision to November 30, 2021 and adding the possibility that Dr. Pietrzak could be asked to pick up additional daytime coverage.

At the time of her initial request in June 2021, Dr. Pietrzak conveyed to her supervisors, Dr. Chintan Mistry and Dr. Richard Bone, both male doctors, that her condition would be monitored continuously and that she and her doctor remained optimistic that her symptoms would eventually subside.

Through November 2021, the accommodation continued and Dr. Pietrzak was not required to take on overnight call shifts.

## C.     Dr. Pietrzak's second accommodation request

In November 2021, Dr. Pietrzak submitted a second accommodation request to be relieved from overnight call indefinitely. The two parties dispute whether the documentation from Dr. Pietrzak's doctor indicated that the restriction would be permanent or not. At this point, Advocate informed Dr. Pietrzak that the accommodation could not continue in its current state but offered to try to identify another accommodation. Over the next few months, Advocate and Dr. Pietrzak exchanged a series of proposals but did not reach agreement.

First, Advocate offered a "pay-back" proposal. This proposal would require Dr.

4

Pietrzak to work five inpatient weekdays and provide one weekend (Friday through Saturday) of daytime coverage in exchange for five weekdays and one weekend of overnight call covered by the other doctors. Dr. Pietrzak contends this proposal was unreasonable because it would have more than doubled her weekend coverage, from six to eight weekends to fifteen weekends a year. This would mean that fifteen times a year she would work two weeks straight without any day off. Dr. Pietrzak was concerned that this could exacerbate her seizures. She says that she was not part of any of the discussions regarding this proposal and that she expressed her disappointment with the proposal at the time. She counter-proposed to work two inpatient weekdays and provide one day of weekend coverage in exchange for five weekdays and one weekend of overnight call covered by the other physicians.

Advocate responded to Dr. Pietrzak's counter-proposal only after she emailed twice to follow up. She also contends that Advocate held a meeting without her to discuss her situation. Dr. Pietrzak then submitted a formal complaint. On February 3, 2022, the RAC responded via a letter explaining the rationale behind its pay-back proposal and its denial of her counterproposal.

After experiencing another seizure on February 3, 2022, Dr. Pietrzak emailed a recruiter to attempt to seek new employment.

On February 17, 2022, Dr. Pietrzak emailed Advocate, stating that the "pay-back" proposal was unfair and that she was being forced to choose between her health and her work. Advocate then proposed a "zero-hour" arrangement. This accommodation would have required Dr. Pietrzak to provide daytime weekday and weekend GI coverage at Advocate's facilities on an as-needed basis with no on-call obligation. Dr.

Pietrzak contends, however, that under this proposal, there would be no guarantee that she would receive benefits and retain a full-time position. This proposal also would have required her to drive to Advocate's hospitals located outside of the Chicago suburbs—as far away as Wisconsin—creating another hurdle because she was unable to drive for six months any time she experienced a seizure.

On April 26, 2022, in response to a letter from Advocate, Dr. Pietrzak proposed a "hospitalist" option in which she would provide inpatient daytime coverage Monday through Friday and not perform any overnight or weekend work. She also requested nurse practitioner support. Dr. Pietrzak alleges that Advocate rejected this proposal without providing any reasons.

To address Dr. Pietrzak's geographical issues with the "zero-hours" proposal, Advocate proposed a "float" proposal. This proposal was essentially the same as the zero-hours proposal except that Dr. Pietrzak would only be assigned to Advocate's facilities in the South Chicagoland area, to address her concerns with driving to hospitals farther away. Dr. Pietrzak responded on May 1, 2022 with several questions, including whether the role would be full-time, whether it would guarantee benefits, and the locations from which she would be working. Advocate responded to this email on May 18, 2022. Dr. Pietrzak, however, found Advocate's email to be vague and non-responsive to her questions and conveyed this to Advocate via email on June 15, 2022. She contends, however, that she informed Advocate that she was willing to move forward with this option and set up a schedule but that Advocate did not respond to her email. Pl.'s Stat. of Facts ¶ 18 ("Plaintiff was willing to move forward with scheduling the pay back proposal and she relayed this to Defendant over multiple emails and

6

correspondence, but Defendant never responded to any of her requests to start working out the schedule.").

During the period from November 2021 until her last day at work in September 2022, Advocate contends, and Dr. Pietrzak does not dispute, that it "accommodated Pietrzak with no overnight or weekend call—without taking on additional daytime call in exchange for overnight coverage from the other physicians." Pl.'s Resp. to Def.'s Stat. of Facts ¶ 64. **C.    Termination**

On or around August 4, 2022, Dr. Mistry and Dr. Bone informed Dr. Pietrzak of her termination without cause. Dr. Pietrzak received a letter from Advocate's president, Dr. Jeff Bahr, explaining her termination was because she was "unable to provide the essential functions of the job" and "had declined any of the solutions." The letter served as contractual notice of her termination without cause, effective December 6, 2022. Dr. Pietrzak continued to work for five more weeks. On August 28, 2022, she sent an email informing Advocate that her final day would be September 9, 2022, explaining that she needed to prepare to move to Florida. On September 16, 2022, in response to Dr. Pietrzak's two-week notice and failure to report to work after September 9, Advocate sent Dr. Pietrzak a notice that she had breached their employment agreement. Under Advocate's reading of the employment contract, Dr. Pietrzak was required to work for 120 days after notice of her termination—in other words, until early December.

**D.    Comparators**

Advocate contends that, ultimately, it accommodated Dr. Pietrzak with no overnight or weekend call from June 2021 to her final day at Advocate on September 9, 2022. A reasonable jury could find, however, that at some point reasonably early during

7

that period, Advocate made it clear that it was unwilling to keep this accommodation in effect for the longer term, at least not without significant modifications.

Dr. Pietrzak contends that Advocate accommodated other male, non-disabled doctors more favorably than her. She points to Dr. Motilal Bhatia and Dr. David Atlas, male doctors who began working at South Suburban around 2018. On their own accord, Dr. Bone and Dr. Mistry relieved Dr. Atlas from overnight call for a period of over nine months from May 2023 to March 2024. Advocate contends this was because Dr. Atlas was the sole GI physician at Trinity Hospital. Dr. Pietrzak notes that Dr. Atlas was ordered to resume overnight call at a time that coincided with her disclosure of Dr. Atlas as a witness in this lawsuit.

Dr. Pietrzak alleges that Dr. Bhatia was provided with whatever he requested from Advocate, although she does not dispute that Advocate denied his request to be relieved from overnight call. Both parties agree that Dr. Bhatia was granted an accommodation for a one-month leave of absence at the beginning of the COVID-19 pandemic.

**E.      EEOC charge and the present lawsuit**

Dr. Pietrzak contends that during the period when they were discussing her condition and potential accommodations, her supervisors and fellow colleagues made mean and inappropriate comments against her, resulting in her feeling bullied and alienated. Such comments included Dr. Lau allegedly suggesting that Dr. Pietrzak was taking advantage of her medical condition, comments which Dr. Pietrzak testified made her cry, and Dr. Bone telling Dr. Pietrzak to take a taxi in an allegedly insensitive manner. Pl.'s Stat. of Facts ¶¶ 21, 30.

8

On September 29, 2022, following her termination, Dr. Pietrzak filed a charge with the Equal Employment Opportunity Commission (EEOC).

In her present suit against Advocate, Dr. Pietrzak asserts ten counts of relief. First, she asserts claims for failure to accommodate, retaliation, and discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12112, 12203(a) (counts 1, 2, and 3). Second, she asserts claims for discrimination and retaliation on the basis of disability and sex in violation of the Illinois Human Rights Act (IHRA), 775 Ill. Comp. Stat. 5/2-102(A), 5/6-101 (counts 4, 5, 8, and 9). Third, she asserts claims for gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(1), 2000e-3a (counts 6 and 7). Fourth, she asserts a claim of a hostile work environment under the ADA, the IHRA, and Title VII (count 10).

## Discussion

Advocate has moved for summary judgment on all of Dr. Pietrzak's claims. Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party is then required to identify material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The Court must construe all facts in the light most favorable to the non-moving party and draw all

reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).

## A. Failure to accommodate (count 2)

An employer discriminates in violation of the ADA if it fails to make "'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee' unless the employer 'can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Pietrzak contends that Advocate failed to accommodate her and refused to engage in an interactive process to determine a reasonable accommodation. To sustain a failure to accommodate claim, Dr. Pietrzak must establish that "(1) [she] was a qualified individual with a disability; (2) [Advocate] was aware of [her] disability; and (3) [Advocate] failed to accommodate [her] disability reasonably." *Scheidler v. State of Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). A qualified individual is one who can, "'with or without reasonable accommodation, can perform the essential functions of the employment position' at issue." 42 U.S.C. § 12111(8)." *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016) (quoting 42 U.S.C. § 12111(8)). In moving for summary judgment, Advocate argues that Dr. Pietrzak is not a qualified individual because her disability rendered her unable to perform an essential function of her job as a GI physician, namely taking overnight call. Advocate further argues that it offered Dr. Pietrzak reasonable accommodations and was not required to agree to the particular accommodations that she proposed.

10

### 1.    Essential function

As stated earlier, Advocate's first argument is that overnight call is an essential function of the GI physician role and that because Dr. Pietrzak's disability prevented her from participating in overnight call, she is not a "qualified individual" under the ADA. The Court finds that Dr. Pietrzak has shown that there is a genuine factual dispute about whether overnight call is an essential function.

To determine whether a particular task is an essential function, courts engage in a fact-based inquiry. "[T]he employer's judgment, the amount of time performing the function at issue, the work experience of prior employees in the same position, and written job descriptions are among the relevant evidence that can be considered to determine the essential functions of a position. 29 C.F.R. § 1630.2(n)(3)." *AutoZone, Inc.*, 809 F.3d at 919. "[E]ssential functions are the fundamental job duties of the position, as opposed to the marginal functions." *Id.* (internal quotation marks omitted); *see* 29 C.F.R. § 1630.2(n)(1).

To support her contention that night coverage was not an essential function Dr. Pietrzak points to language in her employment agreement with Advocate. In a section labeled "Scheduling," the agreement states: "Physician acknowledges that such coverage *may* require Physician to be present at the Assigned Site(s) for a certain number of evenings and weekends as shall be determined jointly by AMG and Physician to be *reasonably necessary and proper*. Physician shall provide 'on call' coverage as *reasonably required* to maintain and sustain the Practice." Def.'s Ex. 8 (emphasis added). The language of this provision may be read to indicate that overnight call is less than essential or, to put it another way, that it is not always

11

required.  Indeed, the provision states that the employer and the physician will "jointly" determine what amount of coverage is "reasonably necessary and proper."  This suggests that there is flexibility around scheduling overnight call that factors in what is reasonable *to the physician*.  This agreement, arguably a written job description, cuts against Advocate's argument that overnight call was an essential function of Dr. Pietrzak's position.  *See Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019) (written job descriptions are a factor in determining whether a duty is an essential function).

Furthermore, it is undisputed that a male physician without a disability, Dr. Atlas, was relieved from overnight call for around nine months.  Although his factual circumstances may have differed from Dr. Pietrzak's, the fact that Advocate relieved him from overnight call for that sort of extended period indicates, again, that coverage of overnight call was something other than an essential function.  *See id.* at 569–70 ("In interpretive guidance, the EEOC has noted that, when assessing the essential functions of a job, 'the inquiry will then center around whether removing the function would fundamentally alter that position.'") (internal citation omitted).  This also tends to support a reading of the employment agreement to the effect that overnight call is a flexible task that Advocate could refine and structure based on, among other things, the needs of the individual physician.

Additionally, if one considers the amount of time GI physicians spent on overnight call, it further suggests that this was not a quantitatively significant task in terms of a physician's overall job responsibilities.  The record suggests that doctors at South Suburban rotated overnight call shifts every few weeks, in contrast with their

12

weekly weekday shifts, which comprise the overwhelming majority of the hours they spend at the hospital. "[T]he amount of time performing the function at issue" is a factor considered in determining whether a particular function is a fundamental job duty. *See AutoZone, Inc.*, 809 F.3d at 919.

Advocate accurately contends that "the employer's judgment is an important factor" in determining whether a job task is essential. *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011). But the court in *Miller* went on to make it clear that the employer's judgment "is not controlling." The Court finds that Dr. Pietrzak has shown a genuine factual dispute regarding whether overnight call was an essential function of her job. In short, the point is one for a jury to determine.

### 2. Interactive process

Advocate argues that even if overnight call was not an essential function of a GI physician, Dr. Pietrzak cannot show Advocate failed its duty to identify a reasonable accommodation because it fully engaged in an interactive process to attempt to find an accommodation. "[T]he ADA obligates the employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances. This step imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (internal citation omitted). But although the ADA envisions a flexible, interactive process, it is not "an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a

disabled individual to perform the essential job functions of the position sought."
*Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000) (internal quotation
marks and citation omitted).  Accordingly, a plaintiff alleging failure to accommodate
should focus on showing "that the result of the inadequate interactive process was the
failure of the [employer] to fulfill its role in determining what specific actions must be
taken by an employer in order to provide the qualified individual a reasonable
accommodation."  *Id.* (internal quotation marks omitted).

### a.    First accommodation request

Dr. Pietrzak requested accommodations twice, in June 2021 and in November
2021.  On the first accommodation request, there is no question that Advocate
participated in the interactive process with Dr. Pietrzak and determined a reasonable
accommodation.  In June 2021, Dr. Pietrzak initially emailed Dr. Pintozzi (her supervisor
at the time) and Dr. Mistry (a senior director and chief medical officer) asking to be
relieved from overnight call for a six-month period.  In response, Dr. Mistry suggested
that Dr. Pietrzak submit the request to the human resources team and engage with
Advocate's Reasonable Accommodation Committee (RAC).  Dr. Pietrzak met with the
RAC to discuss her request, and the committee agreed to it.  Her formal written request
submitted to the RAC was also later approved.  There is no legitimate dispute that Dr.
Pietrzak's first accommodation request was sufficiently accommodated.

### b.    Second accommodation request

Advocate's response to Dr. Pietrzak's second accommodation request submitted
in November 2021, by contrast, did not result in a successful accommodation.  Dr.
Pietrzak contends that Advocate never met with her to discuss her second request,

14

despite repeated requests to arrange a meeting. *See* Pl.'s Stat. of Facts ¶ 14; Pl.'s Resp. to Def.'s Stat. of Facts ¶ 38. Instead, she contends, all communications regarding the second proposal happened via emails and letters. Pl.'s Stat. of Facts ¶ 14. Dr. Pietrzak further contends that Advocate's communications with her were vague and untimely. For example, Advocate responded to Dr. Pietrzak's "hospitalist" proposal only after she emailed about it twice. When Advocate did respond, it rejected the proposal in a few words with no justification. Def.'s Ex. 24. Advocate provided its reasoning for denying this proposal only later, one month after its initial rejection, and only after Dr. Pietrzak had filed a formal complaint with the RAC. Pl.'s Resp. to Def.'s Stat. of Facts ¶¶ 42-44.

The evidence referenced by Dr. Pietrzak would permit a reasonable jury to find that Advocate's conduct relating to the second accommodation request fell short of its obligations under the ADA. "An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1285 (7th Cir. 1996). The evidence would permit a finding that Advocate's communications were unclear and, just as importantly, untimely. More to the point, a reasonable jury could find that none of Advocate's counterproposals amounted to a reasonable accommodation. "An employer satisfies its duty to reasonably accommodate an employee with a disability when the employer does what is necessary to allow the employee to work in reasonable comfort." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012). A jury reasonably could find that was not the case here.

To begin with, the "pay-back" proposal would have required Dr. Pietrzak to work

fifteen weekends a year, as opposed to the normal expectation of six to eight weekends. This would have required her, fifteen times per year, to work every day for two weeks without a day off, which Dr. Pietrzak was concerned could exacerbate her seizures. Dr. Pietrzak says that Advocate told her she had to "take it or leave it." Pl.'s Stat. of Facts ¶ 28. Advocate's "zero-hour" proposal would have required Dr. Pietrzak to effectively give up the security of a full-time position and potentially drive to hospitals ninety miles away, which might have been an insurmountable obstacle because she could not drive for six months after experiencing a seizure. Finally, although Advocate's "float" proposal modified the "zero-hour" proposal to limit Dr. Pietrzak's locations to the South Chicagoland area, she contends that when she asked for clarification on which hospitals she would be assigned to, whether it would be a full-time position with benefits, and the longevity of the position, Advocate's response was vague and unhelpful. She further contends that she was ready to move forward on this proposal and, in particular, to begin scheduling her shifts, but that Advocate was unresponsive.

These facts reflect the existence of genuine factual disputes regarding whether Advocate fulfilled its "affirmative obligation" to engage in the interactive process with Dr. Pietrzak and fulfill its duty to reasonably accommodate her disability. *See Gile,* 213 F.3d at 373 ("Although United argues that Gile's proposed accommodation would have been ineffective, United had the affirmative obligation to seek Gile out and work with her to craft a reasonable accommodation, if possible, that would have permitted her return to work."). The Court also notes in this regard that the sort of accommodation that Dr. Pietrzak sought is specifically contemplated in the text of the ADA: "The ADA defines 'reasonable accommodation' as 'job restructuring, part-time or modified work

16

schedules.'" *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) (quoting 42 U.S.C. § 12111(9)).

For these reasons, Advocate is not entitled to summary judgment on Dr. Pietrzak's claim for failure to accommodate.

## B.  Discrimination (counts 1, 4, 6, 8)

Dr. Pietrzak contends that Advocate discriminated against her on the basis of her disability and sex in violation of Title VII, the ADA, and the IHRA.  Advocate's primary argument for summary judgment on these claims is that she has not presented sufficient evidence that it treated any similarly situated male and/or non-disabled individual more favorably by providing relief from overnight call shifts.

To make out a *prima facie* case of discrimination under Title VII, "a plaintiff must show that (1) [s]he was a member of a protected class, (2) [s]he was meeting his employer's legitimate performance expectations, (3) [s]he suffered an adverse employment action, and (4) [s]he was treated less favorably than similarly-situated employees outside of his protected class." *Jackson v. Ne. Illinois Univ.*, 24 F. App'x. 590, 593 (7th Cir. 2001).  The same is true under the ADA and the IHRA.  *See Bilinsky*, 928 F.3d at 569 ("Illinois courts 'have looked to the standards applicable to analogous federal claims' when evaluating IHRA claims, so we consolidate our analysis of both counts.") (internal citation omitted); *Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022) ("Because Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework, we focus on the federal ADA claims."); *see also Bunn*, 753 F.3d at 685 (explaining that the first element of establishing a prima facie case under the ADA requires showing that the individual is disabled, but otherwise

17

the rest of the test mirrors Title VII).

The first two elements are straightforward in this case.  Dr. Pietrzak is a female and thus a member of a protected class.  Additionally, Advocate does not dispute that she has a disability within the meaning of the ADA.  *See Steffen v. Donahoe,* 680 F.3d 738, 745 (7th Cir. 2012).  Nor does Advocate contend in its motion that Dr. Pietrak was not performing up to Advocate's legitimate employment-based expectations.  As for the third element, it is clear that Dr. Pietrzak suffered an adverse action, specifically termination of her employment.  *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) ("A termination is undoubtedly an adverse employment action.").  Because Dr. Pietrzak has identified at least one adverse action, the Court need not determine at this time whether "[t]he intentional unrealistic proposals made to Plaintiff were additional adverse employment actions."  *See* Pl.'s Resp. to Mot. for Summ. J. at 8.

### 1.    Comparator

That brings us to the fourth element:  whether Dr. Pietrzak has identified a similarly-situated comparator that Advocate treated more favorably.  Individuals are similarly situated if they "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (internal quotation marks and citation omitted).  This is a common-sense inquiry that "is not a 'magic formula,'" and the analysis "should not devolve into a mechanical, 'one-to-one mapping between employees.'"  *Id.* (internal citations omitted); *Orton-Bell v. State of Indiana*, 759 F.3d 768, 777 (7th Cir. 2014).

18

Dr. Pietrzak offers two comparators: Dr. Bhatia and Dr. Atlas. Dr. Bhatia does not fit the bill: both sides agree that Advocate denied Dr. Bhatia's request to be relieved from overnight call. Dr. Atlas's case, on the other hand, presents significant similarities. Dr. Atlas was a GI physician, the same as Dr. Pietrzak. He initially worked at South Suburban in Dr. Pietrzak's group, but he was later transferred to Trinity in 2019. From May 2023 to March 2024, Dr. Pietrzak alleges, Dr. Atlas was relieved from overnight call even though he did not ask for such an arrangement. . At the time, Dr. Mistry and Dr. Bone, who were also Dr. Pietrzak's supervisors and involved in her accommodation requests, assigned Dr. Atlas to a schedule that did not include overnight call.

Advocate argues that the two are not similarly situated because Dr. Atlas was working at Trinity, as opposed to South Suburban like Dr. Pietrzak, and was the only GI physician at the time of the "accommodation." But Advocate has not adequately explained why these two circumstances are enough to render Dr. Atlas's case a non-viable comparison. Both doctors shared the same supervisors and were employed in the same role, yet one of them was granted relief from overnight call and the other was not.

Nor does it change matters that Dr. Atlas did not request the accommodation. Regardless of who initiated the accommodation, Dr. Atlas's case reflects that Advocate was willing to provide a male, non-disabled doctor with a shift schedule that was more favorable than the schedule it was willing to provide Dr. Pietrzak, a disabled, female doctor.

Similarly, the fact that Dr. Pietrzak did not end up working overnight call between her first accommodation request in June 2021 and her last day in September 2022 does

not change the analysis. In November 2021, Advocate expressly told Dr. Pietrzak that her initial accommodation could no longer continue and that she would have to accept an alternate arrangement. Between November 2021 and her termination in August 2022, then, Dr. Pietrzak operated under the understanding that Advocate did not plan to continue the initial arrangement and that she had to make a choice either to accept an alternate proposal or risk losing her job. This was a choice that Dr. Atlas never had to make because Advocate *affirmatively* provided him with the same arrangement. A reasonable jury could find them similarly situated.

### 2. Legitimate, non-discriminatory reason

Because Dr. Pietrzak has established a *prima facie* case of discrimination, the Court next assesses whether Advocate has offered a legitimate, non-discriminatory reason for its action and whether Dr. Pietrzak has successfully rebutted the reason as pretextual. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015) .

Advocate justifies its decision to terminate Dr. Pietrzak by contending that continuing her accommodation caused an undue burden on other physicians and that she would not accept any of the proposals it offered her. Def.'s Mem. on Mot. for Summ. J. at 11. This meets Advocate's burden to articulate a legitimate, non-discriminatory reason for her termination. *See Davis v. Frank*, 711 F. Supp. 447, 454 (N.D. Ill. 1989) ("Typically, an employer attempts to overcome this burden by showing that the challenged criterion is 'required by business necessity' or that providing the necessary accommodations would create 'undue hardship.'") (internal citation omitted).

20

### 3.    Pretext

Dr. Pietrzak argues that Advocate's legitimate, non-discriminatory reason is

pretextual for several reasons:

> 1) evidence of Defendant's undue hardship amounts to nothing more than
> "grumblings" of other doctors who in reality just had to cover five additional
> weeknights of call and one additional weekend of overnight call in a year, and
> were paid extra for it . . . .  2) Plaintiff was accommodated until she was fired,
> which proves it could not have been the severe burden Defendant claims.
> Defendant ignored Plaintiff's requests to move forward with formulating the
> schedule for the "payback" proposal.  Plaintiff was prepared to accept this
> proposal and asked repeatedly to work on the schedule, but it was ignored by
> Defendant. . . .  3) The idea that doctors complaining about not being able to
> drink while watching a sports game is not congruent with common sense, and not
> indicative of any real burden on the business.  No physicians quit or had a
> nervous breakdown because of having to deal with Plaintiff's accommodation.  4)
> Dr. Atlas was kept off of overnight call for almost a year and his call and
> inpatients were shifted over to doctors at South Suburban regularly.

Pl.'s Resp. Mem. to Mot. for Summ. J. at 12-13.

To show pretext, Dr. Pietrzak must "bear[] the burden of demonstrating that

[Advocate's] ostensible justification for its decision is unworthy of credence."  *Gordon v.*

*United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001).  This requires evidence "tending

to prove that the employer's proffered reasons are factually baseless, were not the

actual motivation for the discharge in question, or were insufficient to motivate the

discharge."  *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir.

1998) (internal quotation marks and citation omitted).  The Court finds that Dr. Pietrzak

has shown a genuine factual dispute on whether Advocate's proffered reason for her

termination is pretextual.

First, Dr. Pietrzak has identified inconsistencies in Advocate's conduct.  She

argues that if physicians were truly overburdened by taking on extra overnight call, then

Dr. Atlas's overnight call duties would not have been assigned to other physicians for

nine months. The Court agrees that Advocate has not explained this away sufficiently to take the matter out of a jury's hands.

Second, Advocate's contention that the accommodation caused undue hardship is genuinely disputed. Undue hardship "means something very different from a burden that is merely more than *de minimis*, *i.e.*, something that is 'very small or trifling,'" it means "something closer to . . . 'substantial additional costs' or 'substantial expenditures.'" *See Groff v. DeJoy*, 600 U.S. 447, 469 (2023) (internal citations omitted).

Advocate correctly contends that "effects on other employees' workloads and schedules" can be considered in the undue burden analysis. *EEOC v. Charter Commc'ns, LLC*, 75 F.4th 729, 740 (7th Cir. 2023). But all Advocate offers is that it received complaints from other doctors saying that they were "burnt out" and that Dr. Pietrzak's accommodation had a significant impact on them. *See* Def.'s Stat. of Facts ¶¶ 35, 45. But the support for this is arguably shaky, suggesting the claim is made up or exaggerated. For example, Dr. Mistry said he did not know how many additional weekends physicians had to take on to cover for Dr. Pietrzak. And though he stated, generally, that others complained about "extra work" he was unable to say how many physicians actually reached out to make complaints. Def.'s Ex. 6, Dr. Mistry Dep. at 34-35, 38-39. Dr. Mistry also testified, for example, that "[w]e never talked about [the complaints] in terms of the formal accommodation request. We didn't discuss that with the other members of the group in any sort of formal setting." *Id.* at 37. Dr. Bone's testimony reflects a similar degree of vagueness about the hardship issue. Dr. Bone was asked the following question: "I want to know exactly more along the lines of that

22

with respect to it not being fair to everybody. I know you said you don't know who made those comments in the group as a whole. Do you recall any specific complaints about why it wasn't fair, other than it was just an extra restriction or burden?" He responded that "I think that was the only real reason." Def.'s Ex. 3, Dr. Bone Dep. at 33. . In short, the testimony of Dr. Bone and Dr. Mistry's suggests that the hardship issue was actually not as significant as Advocate later contended.

Third, Dr. Pietrzak has identified an issue of sincerity regarding Advocate's contention that she was unwilling to accept any of its proposals and that their communications reached an impasse. Specifically, a reasonable jury could find that Advocate prompted any breakdown by not responding to her questions regarding the "float" proposal and its failure to reach out to propose a schedule even though she was willing to proceed. Pl. Stat. of Facts. ¶¶ 17, 18.

For these reasons, Dr. Pietrzak has "cast into doubt" the "sincerity of [each of Advocate's] asserted reasons" for the differential treatment against her. Her evidence permits a factfinder to "reasonably infer that unlawful discrimination was the true motivation." *Adreani*, 154 F.3d at 395 ("If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may rationally be drawn. In such circumstances, summary judgment is improper.").

## C. Retaliation (counts 3, 5, 7, 9)

Dr. Pietrzak next alleges that Advocate retaliated against her, in violation of the ADA, IHRA, and Title VII, by terminating her after she asked for accommodations and complained about inappropriate behavior. To survive summary judgment on her retaliation claims under the direct method of proof, Dr. Pietrzak must present evidence

that would permit a reasonable jury to find that "(1) [she] engaged in an activity protected by the statute; (2) [she] suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (Title VII); *Guzman v. Brown County*, 884 F.3d 633, 641 (7th Cir. 2018) (ADA); *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (ADA); *Ellis v. Ill. Hum. Rts. Comm'n*, 2020 IL App (1st) 191871-U, ¶ 34 (IHRA).

Dr. Pietrzak identifies three instances of protected activity: her EEOC charge filed on September 9, 2022; her complaints to Advocate regarding discrimination and harassment; and her requests to Advocate for accommodations. And she identifies two alleged adverse actions that Advocate allegedly took in retaliation of her protected activity: her termination on August 4, 2022 and a post-termination letter sent on August 16, 2022.

The post-termination letter that Advocate sent to Dr. Pietrzak is unlikely to constitute an adverse action. The letter alleges that Dr. Pietrzak breached her employment contract with Advocate and asks her to abide by contractual duties that had been established prior to any of the claimed protected activities. This is different from a letter *changing* the terms and conditions of her employment. *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017). The Court thus sets aside the post-termination letter and focuses on whether a reasonable jury could find that her termination was in retaliation for protected activity.

"[T]ermination is undoubtedly an adverse employment action." *Bagwe*, 811 F.3d at 889 (7th Cir. 2016). Additionally, filing an EEOC charge and requesting

24

accommodations are unquestionably protected activities. *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015) ("[Plaintiff] must have engaged in a statutorily protected activity—in other words, he must have asserted his rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to his disability."). The Court therefore assesses whether Dr. Pietrzak can show a causal link her protected activities and her termination.

First, Dr. Pietrzak's termination cannot have been in retaliation for the filing of her EEOC charge, because the charge came after the termination. The Court therefore turns to her accommodation requests.

Dr. Pietrzak has shown a genuine factual dispute regarding the existence of a causal link between her accommodation requests and her termination. The timing works in Dr. Pietrzak's favor here: the termination came right at the end of (or, in Dr. Pietrzak's telling, in the middle of) the accommodation discussion, and specifically right after she asked questions about the "float" proposal. A reasonable jury could infer from the course of events that Advocate terminated Dr. Pietrzak not because, as it contends, they had reached an impasse and needed to achieve stability, but rather because it got tired of her pressing for a replacement accommodation for her disability and decided to put an end to the discussion by terminating her employment. For these reasons, Advocate is not entitled to summary judgment on Dr. Pietrzak's disability-based retaliation claims under the ADA and IHRA (counts 3 and 5).

This reasoning, however, does not support Dr. Pietrzak's gender-based retaliation claims under Title VII and the IHRA. Unlike her request for accommodations, which were expressly based on her disability, Dr. Pietrzak has not offered any evidence

that she engaged in protected activity that concerned her gender.  *See Anderson,* 104 F.4th at 654-55 (explaining that plaintiff's complaints did not constitute protected activity because its references to gender were "too general and unconnected to her complaints to rise to the level of protected activity.").  There is no basis, then, for concluding that Advocate retaliated against Dr. Pietrzak because of her gender.

The Court notes that Dr. Pietrzak appears to contend that she was retaliated against because she complained about harassment from her fellow colleagues.  But she has not identified when exactly these complaints allegedly were made.  And during her deposition, Dr. Pietrzak suggested that she did not complain to anyone about the claimed harassment.  Def.'s Ex. 1, Dr. Pietrzak Dep. at 148:8-11; 150:18-21.  Without more information on the substance and timing of her complaints, there is no basis for a reasonable inference that the complaints were causally related to her termination.

For these reasons, the Court grants summary judgment on Dr. Pietrzak's gender-based retaliation claims under Title VII and the IHRA (counts 7 and 9), but denies summary judgment on her disability-based retaliation claims under the ADA and the IHRA (counts 3 and 5).

## D.    Hostile work environment (count 10)

To defeat summary judgment on a hostile work environment claim, Dr. Pietrzak must "present evidence [permitting a reasonable jury to find] (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability."  *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (internal quotation marks and citation

omitted).  Although Dr. Pietrzak may have been subject to some uncomfortable comments from her colleagues, she has not identified antagonistic conduct sufficient to give rise to a claim for a hostile work environment.  She points to two arguably rude comments:  Dr. Bone telling her to "take a taxi" and Dr. Cynthia Lau making her cry by suggesting that she was taking advantage of her medical condition.  Without more, however, these "isolated incidents are not so severe or pervasive . . . as to affect the terms and conditions of employment.  While unfortunate, such off-color comments, isolated incidents, teasing, and other unpleasantries are not enough for a Title VII sexual harassment claim."  *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024) (internal quotation marks and citation omitted).

Advocate is entitled to summary judgment on Dr. Pietrzak's hostile work environment claim (count 10).

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment with respect to plaintiff's retaliation claims based on gender (counts 7 and 9) and her hostile work environment claim claims (count 10) but otherwise denies Advocate's motion [dkt. 39].  A telephonic status hearing is set for July 1, 2025 at 9:15 a.m. for the purpose of setting a trial date.  The following call-in number will be used: 650-479-3207, access code 2305-915-8729.

Date:  June 26, 2025

United States District Judge